HATFIELD *versus* MONTGOMERY, et al.

In cases, where the absence of a subscribing witness to a deed is not accounted for, secondary evidence is not admissible, to prove the existence of such deed, or any defeasance connected therewith.

Where the allegations of a bill in chancery, were, *that a slave had been conveyed, with an agreement to allow the privilege of redeeming or repurchasing, to the party conveying*, and the conveyance was on its face, absolute, (the subscribing witness to which, was not produced, nor his absence accounted for,) and there was no positive testimony rebutting the implicit *denial of a defeasance*, by the answer; and a lapse of twenty six years had ensued, without excuse for the delay, the Court refused to disturb the sale.

The *assignee* of such person making the conveyance, held, not to be a competent witness, to prove the defeasance.

In the case of a mortgage, as in other deeds, in which fraud is alleged to have been committed, a party is not entitled to an unlimited time for the prosecution of his rights, *after his knowledge* of the existence of those rights, and of the fraud—but in such case, *after an unreasonable delay*, the law will presume a *payment* or *discharge of the equity*.

In this case a bill was filed in the Circuit Court of Jackson county, by Montgomery and Belcher, for the redemption of a negro slave.

The bill charged, that in the year 1807 or 1809, Hugh Montgomery, the father of the complainant Montgomery, conveyed to the defendant, Hatfield, a negro girl slave : that by an indorsement on the back of the conveyance, (the consideration whereof

was three hundred dollars,) and in consideration of three bushels of salt, the said Hugh had the privilege of *redeeming or repurchasing* the girl, at any time thereafter, on payment of the three hundred dollars and the interest. That afterwards, an offer to redeem was made by the agent of Hugh Montgomery; which offer was rejected by the plaintiff in error. The bill further alleged, that the said conveyance was intended as a mortgage, and that the interest therein of the said Hugh was by him assigned to the complainant, Montgomery, and half thereof by the latter, subsequently transferred to Belcher. It charged, that the indorsement of the condition, so made on the back of the conveyance as aforesaid, was fraudulently defaced by the plaintiff in error, and that the same remained in his possession. The bill was filed on the 5th day of June, 1830, and the only excuse for the delay was the allegation, that Hatfield had removed from the county in Tennessee, where the contract was made, to another county in the same state, and from thence to Jackson county, in Alabama. The answer of Hatfield admitted the conveyance, but denied that any condition was therewith connected, and asserted the same to have been absolute and unconditional. It set out the bill of sale, by which it appeared that there was a subscribing witness thereto, whose absence was not accounted for in the bill. The answer further averred, the allegation of an indorsement of defeasance on the back of the deed, to be false—denied any such indorsement to have been made, and accounted for some stain on the back of the conveyance, (of which profert was made) by averring it to have been caused by accident. The answer also interposed the lapse of time which had accrued between the date of the conveyance and the institution of the action, in bar of the complainant's claim.

The testimony of the agent of Hugh Montgomery, showed, that an offer to repurchase was made by him to Hatfield, which the latter rejected, alleging that the property was *absolutely* his own. No other testimony, important to the principles decided in this case, was produced, and the Court, on a hearing of the cause, rendered a decree for the complainants. The defendant below, took his writ of error to this Court, and among other assignments made, it was insisted,

1. That Montgomery, the complainant, was an incompetent witness.

2. That the subscribing witness to the conveyance should have been produced, or his absence accounted for, before the production of secondary evidence.

3. That the lapse of time, barred the action.

S. PARSONS, for Plaintiff—cited 3 *Johns. Ch. Rep.* 612—2 *Stark.* 747, 780—1 *Conn. Rep.* 147—2 *Stark.* 745, 756—2 *Bac. Abr.* 584, *note a,*—3 *Stark.* 1062, '63—3 *Johns. Ch. Rep.* 371, 375—3 *Johns. Cas.* 316, '18—2 *Equity Cas.* 396—10 *Mod.* 19—1 *Mad. Ch.* 257—1 *Fonb.* 331—3 *Johns. Ch. Rep.* 217—*Story on Bail* 197—8 *Johns. Rep.* 97—1 *Caine's Rep.* 199—5 *Johns. Rep.* 258—1 *Mad. Ch.* 517—*ibid.* 519, 520—2 *Scho. & Lef.* 618, 636, 629, 632, 635, 237, 238, 638, 639—1 *Cokes Rep.* 179—*Ham. Dig.* 215—6 *Johns. Rep.* 543—14 *do.* 501—2 *Bibb* 4—1 *Coke's Rep.* 9—1 *Littell* 191—2 *Marsh.* 58—1 *Johns. Ch. Rep.* 594—3 *do.* 136—1 *Marsh.* 144—2 *Johns. Ch. Rep.* 191—*Wheat. Sel.* 120, *note* 90—4 *Greenl.* 42—2 *Pick.* 368, 5 *Conn. Rep.* 488—1 *Powell on Mort.* 122, *note n.*—*Story on Bail* 235—1 *Powell on Mort.* 126—2 *Bac. Abr.* 372—20 *Johns. Rep.* 528—7 *Cranch* 237—1 *Call* 192—4 *Kent's Com.* 139.

HOPKINS, contra—3 *Marsh.* 293—2 *do.* 576—1 *Stewt.*

163—*Aik. Dig.* 284—1 *Johns. Dig.* 577—2 *Johns. Rep.* 451—*English* vs. *Lane,* 1 *Porter's Rep.* 1st ed. 328—*Powell on Con.* 225, 226—*Story on Bail,* 235—2 *Call,* 256, 362—3 *Peere Williams,* 1st Am. ed. 353, 359—1 *Vern.* 133, 393—4 *Kent's Com.* 153, note b—1 *Vern.* 231—*Story on Bail,* 236—*Powell on Mort.* 392, note 1—4 *Kent's Com.* 126—2 *Scho. & Lef.* 630—*Powell on Mort.* 396, 401—*Story on Bail,* 235—4 *Kent's Com.* 182—9 *Wheat.* 498—1 *Mad. Chan.* 520, '1, '2, 310—*Powell on Mort.* 392, 389—15 *Johns.* R. 3—11 *Wheat.* 311—4 *Johns. Chan.* R. 293—6 *Wheat.* 481—*Angel on Lim.* 281—*Fonb. Eq.* 331—*Aik. Dig.* 281.

By Mr. Chief Justice SAFFOLD:

The defendants in error, P. R. Montgomery and W. Belcher, of Tennessee, charge by bill, that in 1807 or 1809, Hugh Montgomery, father of complainant Montgomery, conveyed to Hatfield, then of Campbell county, Tennessee, a negro girl, *Malinda,* for three hundred dollars. After bargaining for said girl, at the time of making the conveyance aforesaid, said Hatfield, in consideration of three bushels of salt, of the value of five dollars per bushel, paid him by said H. Montgomery, agreed to allow him the privilege of *redeeming* or *repurchasing* said girl at any time for said three hundred dollars, and interest thereon to the time of his offering to redeem; and an indorsement, containing this agreement, on said bill of sale, was then made and signed by Hatfield—That in a reasonable time thereafter, said Hugh Montgomery, by his agent James M. Campbell, tendered to Hatfield the three hundred dollars, with interest, and demanded the negro, which was refused: that the bill of sale is in possession of Hatfield, so that complainants cannot produce the same; but they pray that Hatfield be compelled to produce it: that said con-

veyance is a mortgage, and was so considered by said Hugh, and that said Hatfield has fraudulently attempted to obliterate and deface said indorsement.

The bill further charges, that in May, 1830, said H. Montgomery assigned by instrument, here ready to be produced, all his right, title and interest in said mortgage, to complainant, Montgomery, and that by him, half thereof was assigned to Belcher; and that they would have redeemed said girl, but for the fraudulent conduct of said Hatfield: that, in or about 1817, Hatfield removed from Campbell county, Tennessee, to Marion, in the same state, where he resided until within six or nine months of the filing this bill, when he removed to an obscure part of Jackson county, in this state, with said girl and her issue, (six or eight children,) to avoid this claim; and prays a discovery of the number and names of the issue, &c.: it charges the hire to have far exceeded the three hundred dollars and interest: it prays an answer to all these allegations; that an account be taken; that the bill of sale be cancelled, and the negroes delivered up, &c.

The plaintiff in error, as defendant to the bill, by his answer, positively denies all equity alleged; admits the conveyance, but avers the sale to have been *absolute* and unconditional, according to the terms of the conveyance; he makes profert of it, and exhibits, what he avers to be a copy, such as described by him, purporting to be absolute, and without seal. He further says, the back or white side of the bill of sale, on which there was no defeasance, became defaced by the accidental falling of the paper into some dye stuff. The bill of sale thus brought to view, purports to have been attested by Abner Lozell, as a subscribing witness. The fact of its having been so attested, is not contested. The answer further avers, that this contract was executed not in 1807 or 1809, as charged,

but, in March, 1804, and the bill of sale, as exhibited, bears that date; shewing a lapse of *twenty six years* between the date of the conveyance, and the institution of this suit. The subscribing witness has not been examined, in proof of the alleged contract : his absence is in no way attempted to be accounted for ; nor is any manner of excuse offered, why his depositions were not taken in proof of the alleged defeasance. The contents of the instrument, both the face and the back, are charged as parts of the same contract, simultaneously made; so that a subscribing witness to any part of the conveyance, must be regarded as such, in relation to the entire instrument.

The answer denies that any offer was ever made by Montgomery's agent, or otherwise, to redeem the property : it also denies, that the defendant ever removed for the purpose of avoiding a suit for this property; or that his removals were secret, or to any obscure place.

This brief examination of the bill and answer, is sufficient to present for consideration, a question highly important in principle, and one, which we deem decisive of this case. It is, whether, in the contract between Hatfield and Hugh Montgomery, in which the bill of sale was given, there was any valid agreement for the right to redeem or repurchase the negro girl? If we are warranted in determining there was any, we must conclude there was one substantially such as charged in the bill.

This, as well as all other facts, must depend on the weight of *competent* evidence. Then what is the amount of such evidence ? The testimony of Hugh Montgomery must be rejected as that of an incompetent witness, for reasons presently to be stated.

The evidence of the other witnesses, is vague and conflicting, as respects the existence of any such de-

feasance : so that, if there were no legal objection applying to all the testimony on this point, it is questionable if it could be considered tantamount to two positive witnesses, or one and pregnant circumstances, in disproof of the defendants' absolute denial of any defeasance—a matter clearly within his knowledge, and responsive to the allegation of the bill. Nothing short of this will satisfy the rule of chancery, in this respect. But we are unavoidably led to the inquiry, whether any of the proof offered, on this point, can be regarded as evidence, while the *subscribing witness* remains unexamined ; and while no foundation has been laid for the introduction of the secondary evidence? And is not this an additional objection to Montgomery's testimony?

It is true, as contended in argument, that in the case of *Hall* vs. *Phelps*,[a] the Supreme Court of New-York recognised the competency of secondary evidence to prove the instrument, it being in the nature of a *simple* contract. But it is no less true, that in the subsequent case of *Fox* vs. *Reil, et al*,[b] the former decision was much shaken, even in relation to simple contracts; and entirely repudiated, so far as it could have been supposed to apply to specialties. In the latter, the action was debt on a *bond*, to which was the plea of *non est factum*. At the trial, the plaintiff offered to prove that the bond had been shewn to the defendants a short time before the commencement of the suit, and that they then confessed they had executed it. To this bond were subscribing witnesses, who were not produced; nor was their absence accounted for. In the consideration of the question, respecting the admissibility of the confession, after full argument, the same Court decided, that the admission of the obligors, was insufficient; that the witness must be produced, or in case of his death; or ab-

a 2 Johns. Rep. 451.

b 3 Johns. Rep. 477.

sence from the state, his hand writing must be proved. Chief Justice *Kent*, in delivering the opinion of the Court, reviewed the doctrine at great length. He distinguished this case from that of *Hall* vs. *Phelps*, mainly, on the ground, that one was on a specialty, requiring greater strictness; the other, on a simple instrument, concerning which, as was supposed, the rules of evidence might more safely be relaxed than in case of deeds, which are of much higher force and solemnity in the law, and carry with them internal evidence of good consideration. The Chief Justice, though he had concurred in the former opinion, yielded the authority of any observations therein, applying the same doctrine to deeds. These observations, he said, were to be considered as having been made by way of illustration, and not as applicable to the case then before the Court, and therefore, not authority: that the Courts were certainly concluded, by an ancient and uniform rule of the common law, that, " where the defendant has not acknowledged his deed before a competent public officer, or has not expressly agreed to admit it in evidence on the trial, but has put himself upon his plea of *non est factum,* the plaintiff must produce the subscribing witness, and give the defendant the benefit of an investigation of the circumstances attending the execution of the deed." He shewed, that though the early English law, requiring that the best men in the neighborhood should be registered in the body of the deed, as witnesses of the execution, and that they should form a necessary part of the jury, to try its validity, when denied, had been relaxed; yet, that the Courts were bound by the well established rule before referred to, that an admission or acknowledgment, to supersede the necessity of producing the subscribing witness, must be made before a competent public officer, or there must

9

have been an agreement to admit the evidence upon the trial. He further said, he had met with no case where the absence of the subscribing witness was not accounted for, in which the Courts have allowed in evidence any species of confession by the party, which was inferior in its nature, and less solemn in its form, than as above prescribed. Various other authorities, sustain the applicability of the same rule, to all written instruments which are attested.— *Vide, doe ex dem. Sykes* vs. *Durnford.*[a]

[a] 2 Maul.&Selwin 62, note b.
3 Johns. Rep. 481—Phil. Ev. 357.

The case last reviewed, and those referred to, I think, establish the principle conclusively, that if the rule can be relaxed, (of which I express no opinion,) it can only be in cases of negotiable securities, for the benefit of commerce. The defeasance in question, if one ever existed, being like the body of the instrument, in the nature of a conveyance of property, must require the same grade of proof, whether the instrument be indorsed or not. Had the entire contract, or the defeasance alone been by parol, then this rule of evidence, (as in the case of *English* vs. *Lane,*[b] of the present term,) could have had no application to the case, because it could not have appeared that the parties had in the more solemn manner, agreed to rest the entire contract on written evidence, and to rely on the particular knowledge, or general intelligence and veracity of a designated individual, to prove the agreement.

[b] 1 Porter's R. 328, 1st ed.

In the case of *Rinaldi* vs. *Rives,*[c] it was held that where there is written evidence in the power of the party to procure, parol evidence of the confession or admission of the adverse party, respecting the existence and contents of the instrument, is inadmissible as evidence; that the latter is an inferior grade of testimony. The analagous principle follows, that if an attested instrument has been lost or destroyed, the

[c] 1 Stew. 174.

party claiming the benefit of it must establish the contents by the subscribing witness, if his evidence can be procured, if not, he must remove the suspicion which otherwise arises from its absence, by laying the usual foundation for secondary proof. The late decision of this Court, in the case of *Robinson's adm'r* vs. *Burnett*, maintains the same principle, shews the sacred character of this description of evidence, and that it cannot be dispensed with, when practicable to be obtained; and that the purely voluntary act of the adversary, cannot deprive a party of the benefit of it.

The same principle is strongly maintained, especially in reference to deeds and other instruments intended to have the same effect, by *Starkie in his Treaties on Evidence.* He says "If the deed or instru- [a 1st v. 331,332] ment produced purport to have been attested by one or more witnesses, whose names are subscribed, the party must call at least one of the witnesses; and in cases where the instrument labors under any doubt or suspicion, he ought to call them all : that the law requires the testimony of the subscribing witness, because the parties, by selecting him as the witness, have mutually agreed to rest upon his testimony in proof of the execution of the instrument, and of the circumstances which took place; because he knows those facts which are probably unknown to others. " So rigid," says he, " is this rule, that it is not superseded in the case of a deed, by any admission or acknowledgment of the execution by the party himself, whether the action be brought against the obligor himself, or against his assignees after his bankrupty, nor by any admission of the execution made by the defendant in his answer to a bill in equity," in a different suit:— That, " the rule applies, whether the question be between the parties to the deed, or strangers; whether the deed be the foundation of the action, or but col-

lateral, or whether it still exists or has been cancell-
aSee his nume-
rous authori-
ties here refer-
ed to.
ed; and though the issue be directed by a Court of
Equity, to try the date, not the existence of the deed.[a]

The recent adjudication, in *Henry & Emott* vs.
b 2 Wendell,
575.
*Bishop,*[b] is as strong a case as can be imagined to test
the principle. The action was *covenant.* One whose
name appeared as a subscribing witness to the cove-
nant, (which also contained the names of two other
subscribing witnesses,) was introduced to prove the
execution. He testified that he saw the two other
witnesses subscribe it; that he executed it as attor-
ney for the plaintiff; and that the instrument ever
since its date had been in his possession; and that,
after the period for the performance, the defendant
stated to him his inability to comply with the contract,
and requested that the plaintiff would release him.
But this witness farther stated, that he did not sub-
scribe his name as a witness at the execution of the
instrument, but that he had done so since the trial
had been called on. The Supreme Court there held,
that, as it did not appear but that the *subscribing wit-
ness* might have been produced, and the witness offer-
ed could not be viewed as such, not having attested
the instrument at the time of its execution, his evi-
dence could not be received. In that case, it will be
noticed, there could have been no difficulty respect-
ing the *identity* of the instrument; yet the testimony
was rejected, because the witness offered was not one
of those *selected by the parties,* to make the proof and
explain the circumstances. It is also worthy of re-
mark, that this latter decision was by the same Court,
and twenty years later than in *Hall* vs. *Phelps,* which
has been referred to as an authority on the part of
the defendant in error.

On the particular point, of Montgomery's general
competency as a witness for these complainants, the

case of *Roberts* vs. *Anderson*,[a] is a strong authority against it.   There the principle was ruled, that one who is charged to have fraudulently acquired title to land, and fraudulently conveyed it, though by a mere *quit claim* deed, without covenants, is incompetent as a witness for his grantee, in a suit brought against him by a person claiming it as a *bona fide* purchaser. Here, the question of fraud by Montgomery, as well as by Hatfield, was in issue; and it does not even appear that Montgomery's was only a *quit claim* conveyance to the complainants—consequently, on this ground also, he was incompetent to prove the deed. But if these objections to the competency and certainty of the complainants' evidence could be overcome, when the great lapse of time is considered, I should be constrained to say, the circumstances do not establish the right of redemption, as in case of a mortgage.   In *Conway's ex.* vs. *Alexander*,[b] Chief Justice *Marshall*, in delivering the opinion of the Court, illustrates this subject very satisfactorily.   He maintains the unquestionable right of all persons laboring under no legal disability, to stipulate contracts either in the nature of mortgages, or conditional sales, and sustains the validity of either, according to such stipulations, and the true intent of the parties.   The contrary principle, he says, would transfer to the Court of Chancery, the guardianship of adults, as well as of infants ; and to sustain a sale with a reservation to the vendor of the right to repurchase the same property at a fixed price, and at a specified time, does not conflict with either the letter or the policy of the law.   But, that the policy of the law does prohibit the conversion of a real mortgage into a sale, is clearly conceded : and in doubtful cases, the leaning of all the Courts has been against conditional sales, and in favor of mortgages, as the only effectual means of protecting borrowers of money.

[a] 3 Johns. Ch'y Rep. 371.

[b] 7 Cranch 218

In the same case, it is said, that, as conditional sales, if really intended, are valid, the inquiry in every such case must be, whether the contract in the specific case was intended as a security for the repayment of money or an actual sale ; that the form of the deed in questions of this nature, is not conclusive either way—that " the want of a covenant to repay the money is not complete evidence, but is a circumstance of no inconsiderable importance. If the vendee must be restrained to his principal and interest, that principal and interest ought to be secure." The Chief Justice also remarked, that the adequacy of the price is a highly important consideration in determining whether a contract was intended as a mortgage or conditional sale.—(See also, *Chapman's adm'r* vs. *Turner*.)[a]

[a] 1 Call's Rep. 244.

In the case before us, it appears that the girl was only about nine years of age, and there is not a *scintilla* of proof that the three hundred dollars paid, was not the full value of the slave ; the answer avers it to have been considerably more. Let it also be remembered, that the bill does not simply charge a contract of mortgage; the allegation is, that Hatfield agreed to allow Montgomery the privilege of redeeming or *repurchasing* said girl. Then, if without proof, the truth of the allegation be admitted, surely it could not be contended, that an agreement to repurchase at a subsequent undefined period, but in contemplation doubtless, of only a few years, could entitle the party or his assignee to this privilege, after the lapse of twenty or thirty years. If the evidence clearly disclosed the true intention of the contract, the reasonableness of it could have little or no influence on our deliberations. Our province would only be, to enforce the contract according to the agreement ; or if the intention was incompatible with the law, to en-

force the contract according to its legal effect, if any it had. But here, the intention not being thus manifest, it is proper we should consider the motives which could have induced the contract. Then, can any rational motive be imagined, why Hatfield should have taken a slave *nine years of age*; have advanced an amount of money equal to her *full value*, if not more; made himself responsible for her hire when of any use, and at any rate responsible for a restoration of the girl, with her increase, if any, at the expiration of the twenty six years that have elapsed, or even one fourth of that time, on the re-payment of the three hundred dollars, and interest thereon. The probability of such a contract, is farther excluded by the fact, that no security was taken for the money, when Montgomery's circumstances appear to have been very doubtful; even his personal responsibility does not appear to have been contracted. Had the slave died, the loss must have been Hatfield's; if to live and increase, such a contract, in the time that has elapsed, must deprive him of all the negroes, and thereby affect his interest to the amount of about sixteen hundred dollars, when an absolute purchase of the same slave, or another of the like description, would have secured all without the least responsibility. Before we can conclude that a valid contract of this kind exists, we should require clear and satisfactory evidence of it; and that the complainants had strictly entitled themelves to this advantage. But, as has already been shewn, the complainants, after this long term of time, have not produced to the Court the best evidence the case admits of, or given any excuse for not doing so. Another consideration weighing strongly against the probability that a mortgage was intended, is the further fact, alleged by the complainants themselves, that Montgomery, while deli-

vering up to Hatfield the possession of the negro, with an absolute bill of sale for the same, should not, have taken into his own keeping a seperate defeasance, instead of relying, as he says he did, on an indorsement on the conveyance, to be kept by Hatfield.

The argument of counsel, has involved in this case another question, which, under different circumstances, would require grave consideration. It is, whether the lapse of time between the execution of this contract, and the institution of the suit (being twenty six years) operates as a bar to the relief sought? and if it would, in the absence of any subsequent acknowledgment on the part of Hatfield, have the complainants established sufficient acknowledgments to avoid this bar? Was it not further necessary, that they should have disclosed in their bill any circumstances which could excuse the delay?

After the views already taken of the case, in other respects, I will content myself with a brief notice of these questions. It must be borne in mind, that the defendant, by his answer, as by statute he might, has demurred to the relief sought; and also pleaded in bar the limitation of time, and that the demand is stale.

The counsel for the complainants contend, that, to relief against fraud, as here charged, there is no limitation; and that this is a mortgage of that description, which allows to complainants the period of the mortgagors' life-time to redeem in. I concede, that in .equity a mortgage is regarded as a mere security for a debt; that while it continues a subsisting mortgage, and until foreclosure, the mortgagor continues the real owner of the mortgaged property; and that in a court of law, except as to the mortgagee, the principle is the same: also, that as a general rule, that which is once a mortgage, continues such until the

object be effected. This doctrine is declared more particularly in reference to real estate, but as a general rule, I consider it also applicable to personal property. It does not, however, follow, that if fraud has been practised, the adverse party has unlimited time for the prosecution of his rights, *after his knonledge* of the existence of those rights, and of the fraud committed ; or, that in case of a mortgage, more than any other deeds, that the law will not presume payment or a discharge of the equity, after an unreasonable lapse of time.

An authority, on which both parties appear willing to rely, in reference to this point, is *Maddock's Chancery.* There it is said, that the statute of limitations <sup>1st vol. 256.</sup> cannot be pleaded to a bill for the *discovery merely of fraud,* length of time forming no bar. That, " no length of time," as Lord *Erskine* more than once emphatically observed, " can prevent the unkennelling of fraud." Lord *Notingham* also remarked, that, "*no delay could purge a fraud;* that every delay arising from it, adds to its injustice, and multiplies the oppression." *Maddock,* however, in immediate connection with the above quotations of these distinguished Chancellors, and on their authority and that of others, continues, by saying, " Where the fraud was committed a considerable time back, the bill ought to state, *that it was discovered within six years* before the bill was filed ; or a waiver of the objection as to length of time should appear on the face of the proceedings ; length of time always forming a strong objection, where it can be used to shew *acquiescence,* but in no other way : that " though persons are embarrassed, and reduced by the fraud of others, yet the Courts cannot act upon such circumstances, for then there would be an end of all limitations of actions in the case of distressed persons ; for if relief might be giv-

en after *twenty years*, on the ground of such distress, it may after thirty, forty, or fifty years.

In the case of *Hovenden* vs. *Lord Annesley*,[a] the subject of fraud and of limitations in chancery is examined at great length; and the principle is maintained, that even in cases of fraud, the right must be prosecuted in a reasonable time after the discovery of the facts constituting fraud. The *Lord Chancellor* remarks, that the question as to the simple effect of the lapse of time, is very material: he quotes, with approbation, the old maxim of the law, *Vigilantibus non dormientibus servit lex.* Again, he remarks, that it is said Courts of Equity are not within the statute of limitations: this is admitted in one respect: "they are not within the words of the statute, because the words apply to particular legal remedies; but they are within the spirit and meaning of the statutes, and have been always so considered." I think it a mistake, in point of language, to say that Courts of Equity act merely by analogy to the statutes: they act in obedience to them. The statute of limitations, applying relief to certain legal remedies—for recovering the possession of lands, for recovering of debts, &c.: Equity, which in all cases follows the law, acts on legal titles, and legal demands, according to matters of conscience which arise, and which do not admit of the ordinary legal remedies; nevertheless, in thus administering according to the means afforded by a Court of Equity, it follows the law.

The case of *Shelby's heirs* vs. *Shelby's heirs*,[b] maintains fully the principle, that the statute of limitations will be a bar to any relief sought in Equity, if it be a case where relief could have been given at law; also, that it will run against fraud. In respect to fraud, this exception is admitted, "that where it has been secretly practised, the statute will not be a bar;

*[a] 2 Scho. & Lef. 607.*

*[b] Cook's Rep. 179.*

but it is necessary in such case, to aver in the bill, that the fraud was not discovered within three years before the institution of the suit; and the complainant must shew, at least from circumstances, that he could not well be supposed to have known that he was defrauded at an early period; otherwise this part of the bill will be considered unsupported." An authority,[a] particularly relied on by the complainant's counsel, on this point, has reference to a case where a mortgage on land had lain dormant twenty years, and it was considered that the lapse of time was sufficient to afford a presumption of payment; but that this period was only a circumstance on which to found a presumption, and not in itself a bar. In that case, it was held, that the report of the state officers, by order of the Senate, on the petition of the occupants. of the premises, that the mortgage was outstanding, and which also ascertained the balance due on the mortgage, was sufficient to repel the presumption of payment; especially when connected with the circumstance, that the premises remained uncultivated, and a forest until within six or eight years of the time when the claim was asserted.—Vide *Jackson* vs. *Pierce.*[b] In that case it is shewn, that the agents of the state had formally and solemnly acknowledged the existence of the mortgage, and the balance due upon it. The subject of that litigation was real estate, when of this it is personal; and in this, the lapse of time exceeded that (after deducting for the revolutionary war,) not less than five or six years. In this case also, if all the evidence taken, could be regarded as competent, it would fall short of the other, in respect to the nature and extent of the acknowledgments. The same author, on the same page, cites other adjudged principles, which have a more direct application to the case before us: thus, where there has been

[a] 1 Powell on Mort. 39; a, note 1.

[b] 10 Johns. Re. 414.

no foreclosure, nor entry on the land by the mortgagor, nor interest paid within twenty years, the mortgage is not regarded as a subsisting title.[a] Again—a possession of the mortgagee of a slave for twenty-two years, unaccompanied with any act or acknowledgment, recognizing a mortgage, is a bar to the equity of redemption.[b] He further says, that in determining whether the equity of redemption is gone, the time is to be computed from the last period at which the parties treated the transaction as a mortgage.[c]

In *Marks* vs. *Pell,*[d] a bill was filed for an account, and for a re-conveyance thirty years after the deed alleged to have been a mortgage was given, during all which time the defendant had been in possession. It was there held, (the subject being real estate,) that parol evidence of the mere confessions of the defendant, made seventeen years after the deed, that it was taken as a security for a debt, was insufficient to entitle the plaintiff to relief; that the claim had become too stale to be thus revived.

In *Kane* vs. *Bloodgood,*[e] this subject was very elaborately investigated. The controversy related to bank stock. *The Chancellor* decreed that the statute of limitations was a good plea in equity, as well as at law: that those trusts which are mere creatures of a court of equity, and not within the cognizance of a court of law, are not within the statute of limitations; that so long as there is a continuing and subsisting trust, acknowledged and acted on by the parties, the statute does not apply: but that, if the trustee denies the right of his *cestui que trust,* and the possession of the property becomes *adverse, lapse of time from that period,* may constitute a bar in equity: and that other trusts, which are the ground of an action at law, are not exempt from the operation of the statute.

The Supreme Court of the United States, in *Bell*

*a* 7 Johns. Rep. 283—3 id. 386

*b* 1 Hawks, 17.

*c* 1 Murph. 218.

*d* 1 Johns. Ch. Rep. 594.

*e* 7 Johns. Ch. Rep. 90.

vs. *Morrison, et al,*[a] pronounces the statute of limita- [a] 1 Peters, 351.
tions to be a wise and beneficial law, not designed
merely to raise a presumption of payment of a just
debt, from lapse of time ; but to afford security against
*stale demands*, after the true state of the transaction
may have been forgotten, or become incapable of ex-
planation, by reason of the death or removal of wit-
nesses ; that, therefore, instead of being viewed in
an unfavorable light, as an unjust and discreditable
defence, it should have received such support from
the courts of justice, as would have made it what it
was intended emphatically to be, a *statute of repose.*
The principle was there also recognised, that if the
bar of the statute is sought to be removed by the
proof of a new promise, that promise, as a new cause
of action, ought to be proved in a clear and explicit
manner, and to be in terms unequivocal and deter-
minate; and if any conditions are annexed, they
ought to be shewn to have been performed.

Now, consistently with the established principles
of law, which have been reviewed, and which are
considered more than sufficient on the present occa-
sion, it is impossible the complainants can obtain the
relief sought upon what appear to be the facts of the
case.

After what has been said, it is unnecessary to no-
tice more particularly any of the complainants' evi-
dence, except that of the witness Campbell, who is
regarded as highly reputable, and whose testimony
relating to the alleged tender of the money, is free
from all the objections stated in relation to the other
proofs relied upon. It is in substance, that between
seventeen and twenty years prior to the institution of
this suit, he, as attorney of H. Montgomery, demand-
ed the negro in question, with her increase; he is un-
der the impression that he told Hatfield he had the

amount of money which had been advanced; he does not recollect telling him he would pay the amount of money due, and interest, but that he said to him he was authorised to pay *whatever* might be due on settlement, and would have done so on settlement and delivery of the negroes; but that Hatfield refused to receive the money, saying the negroes were not in his possession; also stating that he had *a good title to them*. The effect of this evidence, whether proof of a legal tender or not, (and concerning which I do not stop to inquire,) is unequivocal and conclusive proof that Hatfield, at that time disavowed the existence of any mortgage or other trust, and openly professed to hold *adversely* to the claim now attempted to be established.

Thus it appears, that after the lapse of six or eight years from the contract, Hatfield denied to Montgomery's agent, which implies full knowledge to the principal, the existence of any defeasance, or any right of redemption; that then there was a farther lapse of say eighteen years, during which this claim was suffered to lie dormant; while Hatfield continued in the peaceable enjoyment of the property. What period short of that which has intervened in this case, would be considered sufficient to bar a claim of this description, is a question of intrinsic difficulty; therefore, no definite opinion is expressed upon it. But we have no hesitation in saying, a period far short of that which has occurred, is amply sufficient; and that it would be so after deducting all the time that could be claimed in consequence of Hatfield's removals, as charged; if such deduction be, on principle allowable.

Then, on this ground, and the absence of competent proof that a defeasance ever existed, we are of opinion the decree of the Court below must be reversed, and the complainants bill dismissed.