# JOHNSON v. JOHNSON.

1. Contracts made between trustee and *cestui que* trust, or between guardian and ward, soon after the latter comes of age, or one standing in the relation of guardian, are viewed with so much jealousy by courts of chancery, that they are voidable by the latter, if within a reasonable time, he seeks to avoid the contract. Such a contract can be supported only where the trustee or guardian, previous to the contract has made such a full and fair disclosure of all the facts or circumstances which have come to his knowledge as such, as to enable the other party to deal with him on equal terms—whether mere inadequacy would not be sufficient to set aside such a contract—*Quere.*

2. A confirmation of an invalid contract, to be operative as such, must be made with full knowledge of all the facts, the ignorance of which rendered the previous contract void, and with the intent that such act should confirm it.

3. The statute of limitations is as available in equity, as at law, in all cases where the courts have concurrent jurisdiction; but the mere staleness of a demand will prevent a court of equity from granting relief when no statute of limitations governs the case.

4. A purchase by a trustee from his *cestui que trust*, though open to enquiry within a reasonable time, puts an end to the trust.

5. A purchase by an administrator of one of the distributees, shortly after he came of age, of all his interest in his father's estate, the administrator having rendered no inventory of the estate, or stated an account, and the purchase being made at a grossly inadequate price, considered fraudulent and voidable at the election of the distributee, if application had been made for that purpose within a reasonable time afterwards, or within a reasonable time after obtaining knowledge of the fraud.

Johnson v. Johnson.

6. After the lapse of eleven years from the making of such a contract, a court of equity will not lend its aid to rescind it, and compel the administrator to account; the distributee having, when the contract was made, or soon afterwards, knowledge of circumstances sufficient to put him on enquiry, and six years afterwards being affected with the notice of the fraud.

7. Notwithstanding a fraud may have been committed, the bar, from lapse of time will be effectual, unless a suit is prosecuted within a reasonable time after the discovery of the fraud; and it is not true, at least in equity, that time does not commence running until after the discovery of the fraud.

8. When lapse of time is relied on by the defendant, if the complainant wishes to avail himself of any of the exceptions to the rule, he must put such matter in issue, either by amending his bill, or by a special replication.

9. An allegation in a bill, that the complainant was not advised, until long after the settlement was made, that a fraud had been practiced on him, is too vague and uncertain. The time when he acquired such knowledge should have been stated.

ERROR to the Chancery Court at Mobile.

This bill was filed in 1835, by the plaintiff in error against the defendant in error.   The bill charged, that the defendant in 1816, became the administrator of the estate of the father of the plaintiff, and possessed himself of the slaves and other property of the deceased.   That he also married the mother of the plaintiff, and reared him in his own family, and treated him very badly, giving him scarcely any education, and clothing him badly; that the estate was but little in debt ; that the administrator never filed an inventory in the county court, or made a final settlement—but shortly after he became of age, induced him to come to a settlement, and representing the estate to be of but little value, obtained from the plaintiff, a conveyance of his interest in his father's estate for the consideration expressed in the conveyance, of one thousand dollars; that of this sum, he received only a negro girl, valued at three hundred and forty dollars, and the promissory note of the defendant for three hundred and eighty-seven dollars, which was all he ever received as his share of his father's estate. That he was not advised, until long afterwards, that his share in his father's estate, was much more valuable than the administrator had represented it to be, and when so advised, and frequently since, applied to him to come to a fair and just account.   The prayer of the bill is for an account and settlement of the estate,

and that the defendant be decreed to pay him one-sixth part thereof, deducting the amount received, &c.

The defendant by his answer admits that he administered on the estate of complainant's father, and insists that he filed an inventory in the Orphans' Court, and that he did, so far as he was capable, correctly administer the estate, having paid between nine and ten thousand dollars of debts due by the deceased; and that he made just distribution among the heirs. That in June, 1824, after the complainant became of age, and had taken the counsel and advice of his friends, being of sound mind, capable of reading and writing, and being well acquainted with the property belonging to his father's estate, he agreed, in consideration of one thousand dollars, to convey, and did convey, to defendant, all his interest in his father's estate, except a claim to some negroes then in suit, which conveyance was attested by two witnesses, and states that he paid the full sum of one thousand dollars to complainant, and also settled with him afterwards, for his share of the negroes in suit, and not conveyed by the deed aforesaid. He admits that the complainant resided in his family, and that he clothed and educated him. He further states, that in September, 1826, the complainant, with another distributee executed to him a bond, in the sum of twelve hundred dollars, with condition to indemnify him against any debts which might afterwards come against the estate—which is also made an exhibit. The answer also sets forth a particular description of the property of the estate, and the disposition made of it, the portions assigned to the other distributees, &c., and relies upon the great lapse of time which has intervened between the final settlement, and the exhibition as a bar to any proceeding in equity, &c.

A large amount of testimony was taken to show the value of the estate in 1824, which, from the view taken by the court, need not be stated. It was also proved, that in 1830, the defendant settled with the husbands of two of the sisters of complainant, and gave to each, eight negroes, one hundred head of horned cattle, a feather bed, &c., as their share of their father's estate.

It was also in proof, that the complainant, at the time, or shortly after the contract was made, was put upon his guard against the defendant, and advised not to settle with him.

Mr. LESSESNE, with whom was Mr. DUNN—contended, that

the settlement made by the defendant with the plaintiff, was absolutely void, being shown to be fraudulent, by the proof, that the plaintiff had no means of knowing the value of his interest in his father's estate, and that the purchase by the defendant, of the plaintiff's interest, shortly after he came of age, at a grossly inadequate price, was a fraud. That in addition, he was *quasi* guardian, and that for that reason also, the contract was void.

That the statute of frauds was not a bar in equity, except where the corresponding remedy was barred at law; that no action at law was given for a distributive share of an estate, and therefore, there was no statute of limitations applicable to it; that mere lapse of time in those cases to which no statute of limitations applies, is always considered by a court of chancery in reference to the circumstances of the case, its object being the repose of titles and the peace of families.

That the rule, that time began to run from the discovery of the fraud, did not apply to cases of a purely equitable nature, as this was; that the allegation in the bill, that the fraud was not discovered until a long time afterwards, was sufficient; the case being purely an equitable one, it was for the defendant to fix the date of the discovery.

That the act relied on as a confirmation could not have that effect, as it appears to have been made in ignorance of the fraud, and without any intention that it should confirm the previous contract without which it could not be a confirmation of the former; that the pretended confirmation was itself a fraud, and the whole transaction the act of a designing, artful man, operating on a young, unsuspicious and ignorant man. They cited, 20 Johns. 576; 2 Porter, 58; 3 Dess. 238; 2 Fon. Eq. t. p. 259; Caro. Law Rep. 508; 3 Johns. C. 216; 7 ib. 126; Angell on Lim 356; 4 H. & M. 277; 1 Johns. C. 316; 2 S. & P. 70; 1 P. Williams, 549–572; 1 Vernon, 586; 3 Battle 218; 4 Dess. 422; 3 J. J. Marshall, 15; 4 Johns. C. 293; 1 Story's Equity, 337; 3 Yerger, 369; 1. Russ. & M. 418; 6 Vesey 270; 2 Schoales & Lef. 483; 1 B. & C. 445; 3 P. Williams, 143; 9 Vesey 297; Fonb. Eq. 260 4 Dess. 706; 6 Wheaton, 497; 3 Marshall, 316; 1 Jac. & W. 63; 2 Vesey, 272; 1 Edwards, 343; 2 Edw. 164.

J. GAYLE, *contra,*—maintained that although the statute of limitations could not be pleaded, nor lapse of time insisted on,

where there was a continuing trust, yet if the trustee deny the right of the *cestui que trust,* and the possession becomes adverse, lapse of time from that period, constitutes a bar in equity.

That in a case where a contract is alleged to have been obtained by fraud, the statute of limitations is a good plea from the time of the discovery of the fraud, and it must be alleged in the bill that the fraud was not discovered within six years, or a waiver of the objection as to length of time, must appear on the face of the proceedings.

That in cases where courts of law and equity have concurrent jurisdiction, the statute may be pleaded in bar as a matter of right, and that in cases of equitable titles, equity adopts the statute of limitations as a positive rule, and requires relief to be sought within the period prescribed, whether of real or personal property.

That although a contract may be set aside for fraud, yet if it is deliberately confirmed, either expressly or by implication, equity will not interfere. In support of these positions, he cited, 7 Johns. C. 90; 2 Porter, 58; 8 ib. 212; 1 Madd. 256; 1 Story's Eq. 73; Story Eq. P. 585, 586, 389, 624; 2 Story's Eq. 735.

ORMOND, J.—This bill was filed by the plaintiff in error against the defendant in error, who was the administrator of plaintiff's father's estate for an account and settlement. The defence set up is, that after the complainant became of full age, in 1824, the defendant accounted with him and fully paid him all that was coming to him from his father's estate; that two years afterwards, he confirmed the settlement so made, and acquiesced in it, until the filing of the bill in 1835, and the defendant relies upon the settlement so made upon the subsequent confirmation, and upon the lapse of time, as constituting a bar to the relief sought by the bill.

In considering the question of the fact merely of a settlement having been made between the parties, the relation which they bore to each other at the time, and that which had previously subsisted between them, will have an important bearing upon it. The defendant as administrator was a trustee for the plaintiff, and not only so, but having married his mother, and reared him in his family, he was *quasi* guardian and stood towards him *in loco parentis.*

Contracts made by persons, between whom the relation of trus-

tee, and *cestui que trust* exists, are viewed with so much jealousy by courts of chancery, that they are voidable by the latter, if within a reasonable time, he seeks to set the contract aside, and can be supported only, when the trustee previous to the contract, has made such a full disclosure of all the facts and circumstances which have come to his knowledge, as trustee to the *cestui que trust*, as to enable the latter to deal with him on equal terms. Even then, in the opinion of Lord Eldon, in Coles v. Trecothick, [9 Vesey, 246,] if there be any inadequacy of price, the contract cannot be maintained; [Campbell v. Walker, 5 Vesey, 678; Saltmarsh v. Beene, 4 Porter, 293.]

The same rule upon analogous reasoning, applies to settlements made by guardians, or persons occupying that relation with their ward, shortly after their coming of age. The superior knowledge of the subject of the contract, and the control which one of the parties has always been accustomed to exercise over the other, prevents that contestation between the parties, which is the principal, if not the only security against unfair dealing. In such cases, the parties do not meet on equal terms, it is therefore almost, if not quite, a matter of course to open the account, or set aside the contract, if seasonably applied for, even when there has been no fraud, or circumvention, if a reasonable doubt exists of the justice of the account. [Hatch v. Hatch, 9 Vesey, 297; Revett v. Harvey, 1 Sim. & Stu. 502.]

The facts of this case are such as to leave but little if any doubt on our minds, that the sum received by the plaintiff, at the settlement made with the administrator, as his share of his father's estate, was grossly inadequate. There is great difficulty in ascertaining the precise value of the estate in 1824, when the settlement was made. No inventory was filed, at least none is produced, or its absence accounted for, and none appears among the records of the Orphans' Court. The answer of the defendant as to the value of the estate at that time, is vague and uncertain, and the estimate of the witnesses exceedingly variant. It is a very suspicious circumstance that no account in fact ever appears to have been stated, but the value of the interest of the plaintiff ascertained from conjecture, or taken at the estimate of the defendant. It is therefore highly probable that the sum received by the plaintiff, at the settlement, fell far short of that to which he would have been entitled upon a fair and just statement of the

account. He has then, upon the principles previously stated, a right to call on the defendant to re-state the account, if he has not, by his subsequent acts, and by his *laches* waived or lost it.

The confirmation set up by the defendant cannot avail him. A confirmation to be operative as such, must be made with full knowledge of all the facts, the ignorance of which, rendered the previous contract invalid, and with the intent that such act should confirm the invalid contract. [Chesterfield v. Janssen, 1 Atkins, 354; Cockerell v. Cholmely, 1 Russ. & M. 418; Butler v. Haskell, 4 Dess. 712.] The transaction relied on here as a confirmation, wants every essential ingredient of such an act, and appears to have been intended for an entirely different purpose—its avowed object being merely to provide an indemnity for the defendant, if debts should subsequently come against the estate. If at the time it was contemplated by the defendant that this bond of indemnity should exert any influence upon the previous contract, such design should have been disclosed to the plaintiff, which does not appear to have been done.

The only question in the cause upon which a difference of opinion could arise, is, whether the *laches* of the plaintiff, in not seeking until after the lapse of eleven years, to disturb his settlement, made as is stated, both in the bill and answer, after he had attained to his majority, ought not according to the principles which govern courts of equity, prevent him from obtaining relief.

It is well settled at this day, that the bar of the statute of limitations is as available in chancery, as at law, in all cases where these courts have concurrent jurisdiction. [Kane v. Bloodgood, 7 Johns. C. 122; Maury's adm'r v. Mason's adm'r 8 Porter, 211; Wood v. Wood, 3 Ala. Rep. 756.] In the case last cited, the bill was filed by a residuary legatee against the executors for an account and settlement of the estate, and this court held, that as by our statute, an action of account was given to a residuary legatee, against the executor, and as that action was barred by the statute of limitations, the bar was effectual to prevent a suit in chancery having the same object.

The bill in this case is filed by a *distributee*, who is not embraced by the terms of the statute just cited, although in reality, no conceivable difference exists between the two cases, except that one claims under a will, and the other by operation of law. As however, no action at law is given for the recovery of a distri-

butive share of an estate, there is no statute of limitations applicable to this case, unless the time within which an action could be instituted on the administration bond, should be held to apply a point not necessary to be determined in this case.

The doctrine that the *staleness* of a demand will prevent a court of equity from granting relief, where no statute of limitations directly governs the case, is peculiar to that court, and has been adopted by it, for the preservation of the peace of society. [2 Stóry's Com. on Eq. 735.] This rule of equity is stated with great force and precision by Lord Camden, in Smith v. Clay, [reported in a note in 3 Brown's C. 639.] "A court of equity which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, when the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity, but *conscience*, *good-faith* and *reasonable diligence;* where these are wanting, the court is passive and does nothing." [See also Hovenden v. Lord Annesley, 2 Sch. & Lef. 634.]

It is quite obvious from the reason of the thing, that no precise rule can be laid down in advance, applicable to this class of cases. Each must, to some extent, depend on its own circumstances, and will be controlled or modified by them, and by analogy to other known and settled rules of law. The subject in dispute will also materially affect the question, as by the statute law, a longer period of time is allowed for bringing suits for the recovery of land after the cause of action accrues, than for personal property. So a court of chancery would grant a longer indulgence when the matter in dispute was land, than when it was personal property, before it would consider it so antiquated as not to be entitled to the aid of the court. The principles applicable to such cases, are admirably illustrated by the Master of the Rolls, in Chalmer v. Bradley, [1 Jac. & Walker, 51.]

It is certainly the general rule that the statute of limitations will not run against a *subsisting* and *continuing* trust, but cases may exist, in which, notwithstanding the trust has never been put an end to, it would after a great lapse of time, be the duty of a court of chancery, to refuse its aid, and presume from such unreasonable delay, either satisfaction or abandonment of the claim; and such, I understand to be the decision of the chancellor, in the case last cited.

These presumptions do not proceed from a belief by the court that the things presumed to be done, have actually taken place. [Eldridge v. Knott, Cowp. 214; Hillary v. Waller, 12 Vesey, 252; Gibson v. Barremore, 5 Johns. C. 550.] "These presumptions (says Chancellor Kent,) to be drawn by courts in the case of stale demands, are founded in substantial justice and the clearest policy. If the party having knowledge of his rights, will sit still, and without asserting them, permit persons to act as if they did not exist, and to acquire interests and to consider themselves as owners of the property, there is no reason why the presumption should not be raised."

This, however, is not the case of a subsisting trust. By the sale and conveyance by the plaintiff, of his interest in his father's estate to the defendant, an end was put to the trust which had previously subsisted. "In purchases by a trustee from his *cestui que trust*, an act is done which though open to enquiry, puts an end to the relation between them; if the purchase stands, he is no longer a trustee, the other party has been permitted to become the beneficial owner. He cannot however, by any act of his own, without communication with his *cestui que trust*, denude himself of the character of trustee, till he has performed the trust." Chalmer v. Bradley, [1 Jacob & Walker, 51.] It has been shown in a previous part of this opinion, that such a transaction is suspicious, and may generally be set aside by the *cestui que trust*, if application for that purpose is made within a *reasonable time*—has that been done in this case?

We entertain no doubt that the time which has been permitted to elapse in this case, eleven years, should prevent a court of chancery from entertaining the cause. From the time the contract was made, the defendant has held and claimed the slaves and other personal property thereby conveyed as his own, with the full knowledge of the plaintiff. The necessary tendency of this long delay must be to increase, greatly, the difficulty if not to render it impossible now to state the account correctly, which as commenced in 1816, would go back a period of twenty-seven years. The death of witnesses, the loss or destruction of vouchers and other *memoranda* of such ancient transactions, which must necessarily have taken place during that long space of time, renders it highly improbable, if not impossible, that the account

should now be justly stated. Indeed the long silence of the plaintiff was well calculated to bury the whole matter in oblivion.

There is no hardship or injustice in requiring a party to assert his rights within a reasonable time after he becomes cognizant of them, and all legal impediments are removed: whilst on the other hand, the repose of society imperiously demands, that unreasonable delay in bringing suits, should not be tolerated. The conviction, that the best interests of the community are thereby promoted, has been constantly gaining strength. The legislature of this State, at its recent session, reduced the time within which suits may be brought for the recovery of real property, from twenty to ten years; and it would be strange if a court of chancery would permit a suitor to create for himself a longer limitation, in a suit for personal property, than the law would allow, if the subject of the suit were land.

It must however, be admitted, that many of the older cases hold a language different from this, especially in cases infected with fraud. Thus, Lord Northington, in Alden v. Gregory, [2 Eden, 280,] is reported to have said, that "no delay should purge a fraud," and granted relief after a great lapse of time. So in Pickering v. Lord Stamford, [2 Vesey, 279,] Lord Alvanley with great reluctance, and apparently against his own convictions, decreed an account after the lapse of forty years, but that was the case of a *continuing* trust, and the party ignorant of his rights. These cases are not now considered law in England, as is shown by the opinion of Lord Chancellor Hart, in the very recent case of Byrne v. Frere, [2 Molloy, 157.] Having stated the law to be different from that advanced in Alden v. Gregory, he says: "This was held differently in Alden v. Gregory, [2 Eden, 280.] But that case is an exception, and it has hardly been followed since Lord Northington's time. The passage there is very strong. He says, 'will delay ever purge a fraud;' and he answers, 'never while I sit here:' but that extreme doctrine, which indeed, his own case did not come up to, although we find it for some time kept alive in the *dicta* of judges, was not acted upon after Lord Northington ceased to sit." He proceeds to comment on succeeding decisions, and says that the decision made in Pickering v. Lord Stamford, would not be followed now, and that the decisions of Morse v. Royal, and Hillary v. Walker, reported in 12 Vesey, 239, 377, have been held since, to be of little authority.

It will be found on examination, that most, if not all the cases in which relief has been granted, after a great lapse of time, were either cases of fraud or *continuing* trusts, in which the parties were ignorant of their rights, or the matter in controversy was land, in regard to which, by analogy to the statutes of limitation, a longer delay has always been tolerated by courts of equity, than when it was personal property. Thus the late case of Bennett v. Colley, [2 M. & K. 225,] was the case of a trust, and the party was ignorant of his rights; but the main ground of the decision was, that he could not have filed his bill sooner than he did.

In Watson v. Toom, [5 Madd. 40,] and Purcell v. Macnamara, [14 Vesey, 91,] relief was given expressly on the ground of the ignorance of the parties of their rights.

Pickett v. Loggin, [14 Vesey, 215,] is a very peculiar case. The delay was twelve years, and the object of the suit was to set aside a conveyance of land obtained by undue influence operating on the abject poverty of the plaintiff, which was so great that a bill filed four years after the transaction was abandoned for want of means to carry it on.

In Murray v. Palmer, [2 Schoals & Lefroy, 474,] after the lapse of twelve years, a conveyance for land was set aside as having been fraudulently obtained. The chancellor admitting the difficulty from lapse of time, granted relief principally on account of the ignorance of her rights. In the subsequent case of Webb v. Korke, 672 of the same book, where the delay was about eleven years in an application to set aside a lease for 999 years, improperly obtained, the chancellor admitted that the objection would be available if the lease had been acted on by the parties, which he showed was not the case.

In Bergen v. Bennett, [1 Caine's Cas. 1,] the court refused to set aside a purchase by a trustee of mortgaged premises at his own sale, after the lapse of sixteen years. In Ray v. Bogart, [2 Johns. Cases, 436,] where eleven years had elapsed without a settlement of partnership accounts; the court refused to entertain a bill. In Rayner v. Pearsall, the court refused to compel the administrator of an executor to account after the lapse of twelve years; and in Bertine v. Varian, [1 Edwards, 347] refused to compel the guardian and administrator of a guardian to account after a delay of eleven years.

It would be a useless consumption of time, to attempt even a

notice by name, of all the cases upon this question. It may, however, we think, be stated as the result of the modern authorities at least, that even where there is a subsisting trust, unless the party was ignorant of his rights, courts of equity will, after a great lapse of time, presume a satisfaction. That if the possession of the *trustee* becomes adverse to the *cestui que trust*, lapse of time from that period may constitute a bar in equity; and this is recognised as the present state of the law upon this subject, in Hatfield v. Montgomery, [2 Porter, 76.]

In this case, as already stated, the trust was destroyed by the contract between the parties. However suspicious that transaction may be, it must, until it is set aside, put an end to the relation which had previously subsisted between them.

But it is insisted that this contract was itself fraudulent, and is therefore void. It by no means follows, that because the contract was fraudulent, that it is therefore a nullity; even a fraudulent contract may be ratified by express agreement, or by long and unreasonable acquiescence in the assertion of rights thereby acquired, with knowledge of the facts. And if during the whole or the principal part of the time which has been permitted to elapse in this case, the plaintiff was cognizant of his rights, and permitted the defendant to act and deal with the property conveyed as his own, he must in this court, be presumed to have abandoned them.

To come to a proper consideration of this part of the case, it is necessary to ascertain what is the case made by the bill. The bill charges that the plaintiff " was not advised until *long after* the settlement was made between himself and said James ; that his claim to his share and part of his father's personal estate and effects was greatly more valuable than the said James had represented the same to be, and that he had been grossly and fraudulently imposed on in said settlement by said James ; and your orator immediately after he was so advised, offered said James to come to a fair and just account, &c." If the design of this allegation was, by anticipation, to remove the objection arising from lapse of time, it must be unavailing. The allegation that he was not advised of the fraud *until long after the settlement,* is too vague and uncertain to be the basis of any action in a court of justice. One man might consider one year, or indeed a shorter period, a long space of time, whilst another might not consider ten

years as entitled to that appellation.  In Bertine v. Varian, [1 Edwards, 343,] a similar allegation, in a bill to prevent the operation of the statute of limitations, was rejected for uncertainty.

When lapse of time is relied on by the defendant, if the complainant wishes to bring his case within any of the exceptions, he must amend his bill or file a special replication, putting such new matter in issue.  [South Sea Comp. v. Wymondsell, 3 P. Wms, 145 ; Bertine v. Varian, 1 Edwards, 343 ; Maury's adm'r v. Mason's adm'r, 8th Porter, 211 ; Hatfield v. Montgomery, 2 Porter, 58.]  And as this has not been done, evidence could not be received to repel the presumption arising from lapse of time.

We are however of opinion, that if the case made by the bill, admitted of proof of facts to excuse the delay in bringing the suit, that it does sufficiently appear that the plaintiff was apprised of the fraud, if not at the time the contract was made, at least soon afterwards.

The law upon this subject is usually stated, that *time does not commence running until after the discovery of the fraud.*  However true this may be, as it respects the plea of the statute of limitations, in a court of law, its correctness may well be doubted, when applied to a suit in chancery in a case where the court acts upon its own peculiar doctrine of discouraging stale demands.  If a considerable period of time has elapsed before the discovery of a fraud, the efflux of time already past should quicken the diligence of one who desired to avoid a contract for that cause, especially in a case, where by the exercise of any diligence, the true state of the case might have been known at an earlier period.

In the late case of Byrne v. Frere, [2 Molloy, 157] already referred to, the chancellor holds this language :  " Now, length of time, of more than twenty years, bars even in a case of fraud, if the party to be barred has become, within any reasonable period, cognizant of the facts.  For if there is the full period of twenty years, it is immaterial that, during much of that time, he had no notice of the fraud.  It is a common mistake to suppose that *time only begins to run from notice of the fraud.*  If the full twenty years are run, and the party has during a reasonable period within that time been cognizant of the facts constituting the fraud, always supposing no disability proved, by which I mean legal disability, and not want of means or poverty, he is barred.  This

court will give him no aid.   It will refuse to be active, even to the extent of compelling a discovery."

In this case, it will be observed, that when the chancellor speaks of *twenty years* being a bar, he has reference to the statute of limitations barring an entry into lands after that period, and which, by analogy, applied to the case before him ; but the case is a full authority to show that in equity, the computation of time is not made from the discovery of the fraud, but that if one having knowledge of the fraud will still lie by and permit the full time to run, within which, if no fraud existed, the court would not interfere, the fact of fraud will not entitle him to relief, although during much of the time, he had no notice of the fraud.

Here, the plaintiff, as appears by the proof, and the internal evidence afforded by the case itself, had such notice previous to the contract being made, as should have put him on enquiry, and subsequently, full and complete notice.

The contract now sought to be set aside, appears not to have been hastily or unadvisedly made.   The relations of the plaintiff were fully apprized of the value of the property which the defendant had in possession, as adminisirator, as is fully shown by their testimony.   It also appears that they considered that the defendant had treated the plaintiff badly during his minority, and it would be a fair presumption that they advised him of his rights when he came to years of maturity : such appears from the testimony to have been the facts.   The defendant in his answer, denying that the plaintiff was ignorant of his rights, says that the settlement was made after the plaintiff had taken the counsel and advice of his friends, and that he well understood what property belonged to his father's estate, and had been often told of its value and amount.   From the testimony of John D. Johnson, it appears that the plaintiff informed him that he had been advised by his relations, and persons of intelligence, not to settle with the defendant.   Joseph Johnson, another witness, deposes, that plaintiff told him previous to the settlement, that he did not intend to settle with the defendant, unless he settled fairly.   After the settlement, he expressed his satisfaction with it, and has done so repeatedly since.   In addition to this, it must be added, that the plaintiff had been familiar, from his boyhood, with the property of his father's estate, in the possession of the defendant, consisting as it did, almost entirely, of slaves.

These facts would have opposed no obstacle to the rescision of the contract, if a seasonable application had been made for that purpose, but they are potent against the application after such long delay. As they show satisfactorily that the plaintiff was put on his guard—that he always had the means of ascertaining the facts—the same means indeed were within his reach, and the same facts were within his knowledge, when the contract was made, or soon after, which existed at the time of the filing of the bill. In 1830 the defendant settled with the husbands of two of the plaintiff's sisters, and paid them a sum as their share of their father's estate, greatly in amount beyond what he had paid the plaintiff. If before, he only had doubts whether the settlement made with the defendant, was correct, here was a fact which should have opened his eyes to the truth. Yet he lies by five years longer, and finally, as appears from the testimony, yielded to the importunity of his friends, when the suit was instituted.

It is not credible that the plaintiff was ignorant of those facts which all the other members of his family were cognizant of, being, as it appears he was, in intercourse with them, and in fact, it appears that they advised him against the settlement, when made, and expressed dissatisfaction with it afterwards. The conclusion, therefore, is irresistable, that he was as well acquainted with the facts, upon which relief is now sought, when the contract was made, or soon afterwards, as he was when the bill was filed.— Nor is there any allegation in the bill entitled to notice, that such is not the fact. The delay which has taken place cannot be ascribed to the defendant, but is the voluntary act of the plaintiff. If the knowledge of the plaintiff of unfairness in the settlement, previous to the settlement of the defendant with the sisters of the plaintiff, could be considered as amounting to conjecture or suspicion only, certainly after that event he must have known the value of his interest, yet he lies by five years longer. According to the decision of Byrne v. Frere, (previously cited,) in computing the time, this must be added to the previous delay, even if that was the first distinct intimation of the fraud, which is hardly possible.

This may be, and probably is, a case in which injustice has been done to the plaintiff, but we feel ourselves constrained to hold, that his *laches* has been so great, as to require this Court not to set so pernicious a precedent, as would be established by granting the relief sought by the bill.

In the argument of the cause, some stress was laid upon the ignorance and supposed imbecility of mind of the plaintiff. There can be no doubt that when the contract was entered into, the plaintiff was an ignorant young man, with but little knowledge of the world; and although it does not appear, and indeed is not alledged in the bill, that his incapacity was so great as to authorize the rescission of the contract for that cause alone; it would certainly have been an important fact if a seasonable application had been made. It can exert no influence whatever now. This decision is not based on the ground that the contract is fair and equal between the parties. On the contrary, we do not doubt that a most unfair advantage was gained by the defendant, but it is founded on the acquiescence of the plaintiff, with knowledge of his rights in this imposition for such a length of time that to permit him now to unravel the transaction, would in effect be to permit him to commit a fraud on the defendant. As to his capacity, it appears that he is a man of ordinary intelligence, having, as appears from the testimony, been the owner of a store, and engaged in the business of merchandize.

The decree of the chancellor must be affirmed; but this is not considered a proper case for costs. Each party will pay his own costs in this court.

GOLDTHWAITE, J., *dissenting.*—In my judgment, the complainant is entitled to all the relief sought by his bill, so far as he claims as a distributee of his father's estate; and he would also be entitled to distribution for his share of his deceased brother's portion, by taking out administration on that estate. I also consider that both these accounts should be stated upon the most rigorous principles known to courts of equity. I shall endeavor, as briefly as possible, to give the reasons which lead me to these conclusions.

The defendant is not to be considered merely as the administrator of the estate committed to his charge, because, in addition to the duties imposed by this office, there was the superadded obligation arising out of his relation to the complainant. The defendant, after his intermarriage with the complainant's mother, stood to him in *loco parentis;* yet we find every obligation violated, and the child that should have been cherished and kindly treated, banished from the house of his mother, and brought up

14

almost as a slave; and this, notwithstanding he was entitled to an estate amply sufficient for his support. For eight years the complainant is suffered to remain in this condition, and when on the eve of his majority, but yet during his actual minority, the defendant makes a pretended settlement, and takes from him a conveyance of all his rights for a grossly inadequate consideration. This transaction is considered by all the members of the court as fraudulent, but a majority of the judges hold that the *laches* of the complainant has been such, as, in connection with the subsequent transactions between these parties, to debar a court of equity from listening to his complaint.

I apprehend that no case whatever can be found where such a transaction as this has been sustained by a court of equity. The universal rule is, that if a trustee will deal with his *cestui que trust* he must always be prepared to shew that the dealing is entirely fair, made upon the fullest communication of all the facts and circumstances connected with the trust property, and upon the payment of a consideration fully adequate. It does not rest with the *cestui que trust* to shew by evidence that the dealing is unfair, or that an advantage has been taken of him; but the *onus* is cast on the trustee to support it. A multitude of cases might be cited in support of this principle, but one of recent date will be sufficient for reference, [Hunter v. Atkyns, 1 Coop. S. C. 464. See 8 Cond. E. C. 497.]

I presume the same principle applies to any pretended confirmation of any such dealing subject to impeachment, that is, that there must be full and complete information of all the circumstances of the trust estate; but beyond this, the act which is relied on as a confirmation, must be done with the intention of confirming the previous act, and with the knowledge that it might be so impeached in a court of equity. [Murray v. Palmer, 2 Sch. & Lef. 474, see 486; Morse v. Royal, 12 Vesey, 355, see 494; Cockerell v. Chalmeley, 1 R. & M. 425, see 4 Cond. E. C. 494.]

What then are those acts which are supposed to be confirmatory of the fraudulent settlement? In 1825 the defendant paid the residue of a note which was given when the former transaction was consummated, and he then procured the complainant to endorse on the note, or to sign an endorsement so made, that the payment was in full of the balance due him of negro property belonging to the estate of his father, and of other things of a per-

sonal nature.   Now this seems to me to be nothing but a contrivance, as is said in Wiseman v. Beake, [2 Vernon, 121,] to double hatch the cheat.   This note bears the same date, and evidently was given when the settlement was made, and I have no doubt, was a part of the consideration given for it, though the defendant asserts that it was the consideration for the return of the complainant's interest in the slaves Charles and Sue, and her issue, without paying for which the complainant would come to no final settlement.   This assertion is utterly inconsistent with the return exhibited, for by that it appears these slaves were expressly excepted from the settlement, as they were then involved in a chancery suit.   A previous part of the answer asserts, that after this suit was disposed of, the defendant settled with the complainant for his share of these slaves.   The receipt made on the back of the note, is a release in its terms, not only for all the negro property, but is also for all other things of a personal nature ; the former release too, contains the same general expressions, yet it is entirely evident that the cattle belonging to the estate were not then divided.   Certainly this mode of taking releases on the back of notes, is a very suspicious way of confirming a fraudulent transaction, or of conveying the necessary information to enable one to act advisedly.   When the defendant is pressed, as I infer, for a division of the cattle, he makes the opportunity to involve the complainant in another writing, by which he agrees to bear his proportion of any debts which may subsequently come against the estate.   This is more than ten years after the grant of administration, and I have much difficulty in conceiving what claims could then exist for which the defendant, as administrator, could then be made liable.   But however this may be, the paper carries intrinsic evidence that its execution was induced by the idea that otherwise no division could be had.   The declarations made by the complainant, subsequently to the settlement, that he considered it as fair, and that his uncle had dealt justly by him, are consistent with his want of information with respect to the true condition of the estate, but are utterly inconsistent with the feelings which he must have entertained, if he had known its true value.   Nothing, in my opinion, is more clear from the evidence, than that he had no suspicion that he had been defrauded, until the period when the defendant settled with the husbands of his two nieces.   This was in 1830 ; but even at

that time the complainant had not the necessary information to enable him to ascertain the extent to which he had been defrauded.

Being satisfied that the supposed confirmatory acts and declarations have no weight in this case, I will proceed to consider the lapse of time. The complainant was born in July, 1803, and consequently came of age in that month, in 1824. This bill was filed, as I infer from its first continuance, in the summer vacation of 1835; therefore, eleven years had elapsed from the period of his majority, and a few days beyond that from the time of the settlement, that having been made the 18th of June, 1824.

I think there has sometimes been a great misapprehension of the celebrated decisions of Lord Camden, in Smith v. Clay, [Amb. 645,] but better reported in 3 Bro. C. C. 639; and of Lord Redesdale, in Hovenden v Lord Annesley, [2 Sch. & Lef. 633.] Neither of these most eminent men intended to be considered as saying that all cases were within the influence of time, for the judgment of the first is given with reference to a bill of review, and the case of a concealed deed, is by him expressly excepted; and in the opinion of the last, it is conceded, [see page 633,] that a trustee *in possession of the trust estate* can never avail himself of the lapse of time as against his *cestui que trust.* The same admission is made by Sir William Grant, in Beckford v. Wade, [17 Vesey, 88—see 97.] It is only cases of *constructive,* and not of *direct* trust, in which time operates *as a bar.* It is true that even in cases of direct trust, time has its influence, but it is only by way of evidence, in the same manner as length of time would create the presumption of payment of a bond at common law. [Morse v. Royal, 12 Vesey, 355—see 377.] Doubtless, there was a period in the court of chancery of England, when the notion of trust and fraud was carried to a very improper extent, but the doctrines promulgated by Lords Camden and Redesdale, were not new even in that court; for Lord Macclesfield, in Lockey v. Locky, [Prec. in Chan. 518] had long before recognized and acted on the true rule. That was the case of a constructive trust, one having secured the profits of an infant's estate, after six years, was held, entitled to the protection of the statute of limitations. Whether the same rule could be applied to an actual guardian, I need not consider, further than to say, that in my opinion, it could not, at any rate, until the relation was dissolved, and the estate surrendered. I admit that the effort of courts of equity, ought al-

ways to be to bring all cases within general rules, so that as little may be left to individual discretion as may be, and that such is the constant course of judicial decision; but I apprehend there is, or can be no middle ground, between bringing every case within the analogy of the statutes of limitation, and the similar analogy of common law presumption, or leaving it to the broad discretion of each individual judge. I think the English chancellors, (and I do not speak of them as differing from American judges, but because an examination of the whole number of cases on this subject would make a volume) have placed this subject on its true foundation; and when they speak of each case, resting on its own circumstances, to let in or exclude the bar of time, when the case is not controlled by the statute, they are to be understood as speaking of the circumstances as matter of evidence, from which a satisfaction might be presumed, a confirmation inferred of an impeachable settlement, or if necessary, a release. [Morse v. Royal, *supra;* Hillary v. Waller, 12 Vesey, 239; Hercy v. Dinwoody, 2 Vesey, jr. 87.] I think it very clear that such was the opinion of Lord Redesdale, as he gave the decree in the case of Murry v. Palmer, [2 S. & Lef. 474,] only a very few months in advance of that in Hovenden v. Lord Annesley, and then granted relief after a lapse of 12 years, and when the plaintiff had each year, received the interest of the purchase money of a sale made by her trustee in violation of her rights.

In the very recent case of Bennet v. Colley [2 M. & R. 225. See 7 Cond. E. C. 342,] it was held that thirty years acquiescence of a party ignorant of his rights, was neither a waiver, or a confirmation of any thing done against him. The object of the suit was to obtain compensation out of the trustee's estate for a breach of duty.

The case of Alden v. Gregory, [2 Eden, 280,] is in all material features, precisely similar to this, and there a conveyance was set aside, and account decreed after a lapse of more than 40 years.

Cases are very numerous also, in which accounts have been unravelled as between trustee and *cestui que trust,* after great lapse of time, upon allegation of fraud or mistake. [Whatton v. Toone, 5 Madd. 53, after sixteen years; Vernon v. Vawdry, 2 Atk. 119, twenty-three years; Pickering v. Stamford, 2 Vesey, jr. 272, an account decreed in favor of next of kin, against executors after forty-one years; Lewis v. Morgan, 5 Price, 42,

accounts of thirty years, were unravelled; Purcell v. Mcnamara, 14 Vesey, 91, & Pickett v. Logan, ib. 285, deeds were set aside after fifteen years.] In Whalley v. Whalley, [1 Merrivale, 436,] it is admitted that time is not a bar when the *cestui que trust* seeks to set aside a deed for the fraud of his trustee and against him.

This recital of cases might be greatly extended, but I consider them as sufficient to show that time is no bar whatever to such a suit as this, and that unless a satisfaction can fairly be presumed, an account must be allowed.

Independent of any decision upon this subject, it seems to me, that when it is conceded that the mere delay of a distributee to call for an account, will not impair his claim upon the administrator, it would be monstrous to suppose he could effect his discharge by a fraudulent settlement, for that would be giving premiums for fraud.